This is an appeal from an order admitting to probate the will of Teresa C. Delaney. The sole ground of appeal is that the Orphans Court erred in its finding sustaining the testatrix's mental capacity.
The test in such cases is whether the testatrix possessed the required mental capacity at the time of the execution of the will, and if she did, the will is valid regardless of incapacity at a prior or subsequent time. Mental capacity is presumed, and the burden of proving the incapacity of the testatrix to make her will rests upon the appellants. Although the point of time at which testamentary capacity is to be tested is that of the execution of the will, the antecedent and subsequent condition of the testatrix may have a bearing upon the mental capacity of the testatrix at the time she executed her will.
In the instant case the testatrix on Thanksgiving Day in November, 1940, expressed her intention to make a will and the manner in which she desired to distribute her estate and *Page 455 
mentioned the persons who would share in her estate. The will in question was executed in the evening of January 15th, 1941, at about six-thirty o'clock, and carries out her intention expressed in November, 1940. The deceased suffered a paralytic stroke on January 10th, 1941, on which day she was removed to the St. Elizabeth Hospital, where she died five days later.
Great weight with respect to mental capacity attaches to the testimony of the subscribing witnesses to the will. They are placed around the testatrix for the very purpose of attesting to the circumstances existing at the moment of execution and are competent to testify to the mental capacity of the testatrix. The testimony of the subscribing witnesses is clear and convincing to the effect that the testatrix was of sound mind and understanding. Her will was drawn by the witness, John L. McGuire, a member of the bar, who says that he spoke with the testatrix about mutual friends and acquaintances for some time before and after her will was executed; that her answers were intelligent and her recollection of persons, places and affairs was clear; that she insisted upon reading the will before she signed it; that when he read the will to her he purposely left out a word now and then whereupon the testatrix immediately corrected him; that she requested Margaret Atkinson, the other witness present, to sign as a subscribing witness and then declared it as her last will and testament in the presence of both witnesses.
Miss Atkinson, the other subscribing witness, says that she knew the testatrix for many years; that on a visit to the home of decedent on Thanksgiving Day, 1940, she told her she intended to make a will after the New Year and that she would disinherit Ellen Dunn, giving her reason therefor. This witness also testified to the mental capacity of the deceased. Present in the case and bearing upon the mental capacity of the testatrix is also the testimony of a number of other witnesses who called on the testatrix while she was in the hospital, including the testimony of Dr. Thomas Hunt who attended the decedent in her last illness. All say she was possessed of sound mind and understanding both before, at the time and after the execution of her will. *Page 456 
The proof offered to refute testamentary capacity is based upon certain entries made in the hospital records by attending nurses to the effect that testatrix was "irrational at times." Such entries were made because the testatrix at times attempted to get out of bed saying she had some business to attend to, and because she talked continuously. But there is no testimony on the part of the nurses to the effect that the deceased was mentally incompetent at the time of the making of her will.
Testimony of doctors produced on the part of the appellants and who based their testimony upon the records kept by the nurses but who were not present at the time the will was executed is as follows: Doctor Holtzman: "Q. Doctor, in the early evening, late afternoon or early evening of the 15th, would you say that at that time she could have been in her full senses? A. I will definitely say she was not in her full senses. The record [nurses' record] definitely states that she is talking continuously which, of itself, shows evidence of delirium. Even though it does say that she was irrational at times, there is also an entry there of talking continuously. Now, no normal person talks continuously, and I am sure that what she was talking was not rational, if she is talking continuously. That is the only thing I can say. I think it is quite a hard question to answer, but there is the entry of talking continuously."
Dr. McCallion was asked whether he had read the entire record as kept by the nurses, and if so, whether in his opinion on January 15th, 1941, late in the afternoon at about six or six-thirty, or between six and seven o'clock, he would say that the deceased, under those conditions could be of sound and disposing mind. "A. Because of the nurse's notes, I would rather hazard that the nurse's notes indicate the woman was irrational. Q. Doctor, when you say you hazard that, could you put that in the form of yes or no? A. I could not, naturally, I could only hazard that from the nurse's notes. Q. By hazard, you mean what? A. I would rather question the competency of the patient." The same question was put to Dr. Denholtz and he answered, "I don't think so." Such testimony is so vague and uncertain in view of the presumption *Page 457 
in law of mental capacity as to render it worthless. To constitute a sound and disposing mind and memory, it is not essential that the mind should be unbroken, unimpaired, unshattered by illness or disease. Not every discomposure of the mind will render one incapable of making a will; it must be such a discomposure, such a derangement, as to deprive one of the rational faculties common to man.
After reading and considering all the testimony offered by appellants as to the mental capacity of the testatrix, I conclude that appellants have not sustained the burden of proof and that testatrix was of sound mind, memory and understanding when she made her will and fully comprehended the act she was doing and the effect thereof.
 The decree of the Union County Orphans Court is affirmed. *Page 458